# Exhibit A

DOCUMENT 1

PURCHASE ORDER FINANCING AGREEMENT

dated as of November 26, 2024

by and among

SPACE CITY CEMENT, LLC
as the BORROWER,

THE PERSONS PARTY HERETO FROM TIME TO TIME AS GUARANTORS

and

TRADELAND GROUP, B.V.
as the LENDER

PURCHASE ORDER FINANCING AGREEMENT

This PURCHASE ORDER FINANCING AGREEMENT (this "Agreement") dated as of November 26, 2024 (the "Closing Date"), is entered into by and among SPACE CITY CEMENT, LLC, a Texas limited liability company (the "Borrower"), each Person party hereto from time to time as a Guarantor and TRADELAND GROUP, B.V., as lender hereunder (in such capacity, together with its successors and assigns, the "Lender").

## ARTICLE 1
## DEFINITIONS

Section 1.1 Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"Advance" is defined in Section 2.1.

"Advance Request" is defined in Section 4.1(b)(ii).

"Advance Limit" means $7,500,000.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person.  A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.

"Aggregate Fair Market Value" means, with respect to the Pledged Interests (as defined in the Pledge Agreement), as of any date of determination, the aggregate purchase price that a willing buyer (or buyers) having all relevant knowledge would pay a willing seller for the Pledged Interests (as defined in the Pledge Agreement) in an arm's length transaction (or a series of related transactions), as determined by each of the Individual Guarantors and the Lender; provided, however, that if the Individual Guarantors and the Lender are unable to agree on the Aggregate Fair Market Value of the Pledged Interests within a reasonable period of time (not to exceed a period of thirty (30) days), such Aggregate Fair Market Value shall be determined by a nationally recognized investment banking, accounting, or valuation firm jointly selected by the Lender, in consultation with the Individual Guarantors, which firm is explicitly authorized to consider factors such as lack of control, lack of marketability, and minority interest in making such determination. Notwithstanding anything herein or in any other Finance Document to the contrary, the determination of such firm shall be final and conclusive, and the fees and expenses of such firm shall be borne by the Obligors and constitute part of the Obligations hereunder.

"Agreement" means this Agreement, as amended, restated supplemented or otherwise modified from time to time.

"Borrower" is defined in the preamble of this Agreement.

"Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in Houston, Texas or New York City, New York are authorized or required to be closed.

"Change of Control" means an event or series of events by which the Individual Guarantors cease to (i) own and control fifty-one percent (51%) of the outstanding equity interests of SCCD (directly

2

or indirectly) on a fully diluted basis, (ii) own and control fifty-one percent (51%) of the outstanding equity interests of the Borrower (directly or indirectly) on a fully diluted basis or (iii) have the power (directly or indirectly) to vote more than fifty percent (50%) of the equity securities having ordinary voting power for the election of managers of the Corporate Obligors or to direct or cause the direction of the management and policies of the Corporate Obligors, whether through the ownership of voting stock, by contract or otherwise.

"Closing Date" is defined in the preamble of this Agreement.

"Collateral" has the meaning given to such term in the Pledge Agreement.

"Confirmed Purchase Order" is defined in Section 4.1(b)(i).

"Corporate Obligor" means, collectively or individually as the context may require, each Obligor other than the Individual Guarantors.

"Default" means any of the events specified in Section 5.1, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Due Date" means, with respect to any Advance, the earlier to occur of: (i) the date that is ninety (90) days following the date such Advance is deemed made hereunder and (ii) the date that all or substantially all of the Product financed with the proceeds of such Advance has been sold to, and paid for by, the Borrower's customers, whether or not Borrower has retained such proceeds.

"Effective Date" means, with respect to any Financed Purchase, the effective date of the purchase by the Borrower of the applicable Product as set forth in the applicable Confirmed Purchase Order.

"Event of Default" is defined in Section 5.1.

"Existing Bank Facility" means collectively, those certain loans, extensions of credit and other financial accommodations made available to the Borrower pursuant to (i) that certain Account Purchase Agreement and Guaranty dated as of October 26, 2022, by and among the Borrower, Individual Guarantors, and Crown Financial Services, LLC, as the same may be amended, restated, supplemented or otherwise modified from time to time, and (ii) that certain Promissory Note dated July 9, 2023, by and amount Borrower, SCCD, and Eleen Marine Commercial, Ltd., as the same may be amended, restated, supplemented or otherwise modified from time to time, including as amended by that certain First Amendment to Promissory Note, dated January 9, 2024. As of the Closing Date, the total outstanding principal balance owed by the Borrower under the Existing Bank Facility, together with any and all accrued but unpaid interest thereon and other amounts owing thereunder, is equal to $1,370,482.81.

"Finance Documents" means, collectively, this Agreement, each Note, each Guaranty, the Pledge Agreement and any and all other documents, instruments or agreement executed or otherwise delivered by the Borrower or any other Obligor in connection therewith, in each case, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Financed Purchase" is defined in Section 2.1.

"Governmental Authority" means any national, state or local government (whether domestic or foreign), any political subdivision thereof or any other governmental, quasi-governmental, judicial,

4869-6232-3442.14

public or statutory instrumentality, authority, body, agency, bureau or entity (including, without limitation, any taxing or zoning authority), or any arbitrator with authority to bind a party at law.

"Guaranteed Obligations" is defined in Section 7.1.

"Guarantor" means, collectively or individually as the context may require, SCCD, each Individual Guarantor and any other Person that joins, and agrees to be bound by the terms of, this Agreement as a Guarantor or executes a Guaranty in favor of the Lender after the Closing Date.

"Guaranty" means, collectively or individually as the context may require, the guaranty made by the Guarantors party to this Agreement pursuant to Article 7, each other guaranty delivered by a Guarantor in favor of the Lender pursuant to this Agreement and all other instruments, documents and agreements delivered by any Guarantor to guarantee or purport to guarantee the payment and performance of the Obligations, in each case, as the same may be amended, restated, supplemented or otherwise modified.

"Individual Guarantor" means, collectively or individually as the context may require, each of John Mecom III and Kevin Harper.

"Lender" is defined in the preamble of this Agreement.

"Lien" means any mortgage, deed of trust, lien, pledge, charge, security interest or encumbrance of any kind in respect of any property or asset, whether or not filed, recorded or otherwise perfected or effective under applicable law, or any preference, priority or preferential arrangement of any kind or nature whatsoever including the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such asset.

"Maturity Date" means, with respect to any Advance, the earliest to occur of: (i) the Due Date applicable to such Advance, (ii) the occurrence of a Change of Control, (iii) the acceleration of such Advance pursuant to Article 5 and (iv) the Termination Date.

"Note" is defined in Section 2.2.

"Obligations" means, collectively, all obligations, indebtedness and other liabilities of every nature of each Obligor owing to the Lender (or any of its Affiliates) under this Agreement or any other Finance Document (including, without limitation, any Confirmed Purchase Order financed with an Advance hereunder), whether for principal, interest (including, without limitation, interest which, but for the filing of a petition in bankruptcy with respect to such Obligor, would have accrued on any Obligations, whether or not a claim is allowed against such Obligor for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise, including, without limitation, any and all documented costs and expenses (including reasonable attorneys' fees and expenses) paid or incurred by the Lender and payable hereunder or under any other Finance Document (including, without limitation, pursuant to Section 8.1 hereof).

"Obligor" means, collectively or individually as the context requires, the Borrower and each Guarantor.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

4

"Pledge Agreement" means that certain Membership Interest Pledge Agreement dated as of the Closing Date by and among each Obligor party thereto and the Lender, as the same may be amended, restated, supplemented or otherwise modified from time to time, pursuant to which the Obligors party thereto have pledged to the Lender certain membership interests in SCC and SCCD held by such Obligors, subject to the terms thereof.

"Product" means any product to be supplied by the Lender to the Borrower pursuant to the terms and conditions of a Confirmed Purchase Order.

"Property" means any right, title, or interest in or to property or asset of any kind whatsoever, whether real, personal, or mixed and whether tangible or intangible.

"Purchase Order" means any purchase order for Product submitted by the Borrower to the Lender (or its Affiliate), in form and substance satisfactory to the Lender and providing the details required to be included therein by this Agreement.

"Purchase Price" is defined in Section 2.1.

"SCCD" means Space City Cement Distribution, LLC, a Texas limited liability company.

"Termination Date" is defined in Section 2.8.

"Termination Notice" is defined in Section 2.8.

Section 1.2 Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, equity interests, securities, accounts and contract rights.

**ARTICLE 2**
**AMOUNT AND TERMS OF ADVANCES**

Section 2.1 Advances. Subject to the terms and conditions hereof, upon request from the Borrower, the Lender may, from time to time until, but excluding, the Termination Date, in its sole and absolute discretion, extend (or be deemed to extend) credit to the Borrower (each such credit extension, an "Advance") to enable the Borrower to finance up to one-hundred percent (100%) of the agreed purchase price (the "Purchase Price") of any Product purchased from the Lender (or its Affiliate) pursuant to a Confirmed Purchase Order (any such purchase financed with an Advance, a "Financed Purchase"). Notwithstanding anything to the contrary herein, in no event shall (i) the

5

proceeds of any Advance finance more than one-hundred percent (100%) of the applicable Purchase Price with respect to any Financed Purchase, (ii) more than two (2) Advances be outstanding at any time, or (iii) the aggregate principal amount of all Advances outstanding at any time exceed the Advance Limit. The amount and timing of any proposed Advance hereunder may be established by the Lender in its sole and absolute discretion.

Section 2.2 Note. Each Advance made (or deemed made) by the Lender hereunder shall be evidenced by a secured promissory note in an original principal amount equal to such Advance, substantially in the form of Exhibit A (each, a "Note"), which is to be issued by the Borrower in favor of the Lender as of the Effective Date of any Financed Purchase pursuant to the applicable Confirmed Purchase Order.

Section 2.3 Advances Deemed Made. Upon the election of the Lender to make any Advance pursuant to Section 2.1 in connection with any Financed Purchase, subject to the satisfaction of each of the conditions set forth in Article 4, such Advance shall be deemed to have been made by the Lender automatically upon the Effective Date of such Financed Purchase as set forth in the applicable Confirmed Purchase Order. For the avoidance of doubt, in no event shall the Lender be required to fund any Advance hereunder in cash.

Section 2.4 Interest.

(a)    Subject to Section 2.4(b), the outstanding principal balance of each Advance shall bear interest at an annual rate equal to nine percent (9%). Interest shall be computed based on a 360-day year and the actual number of days elapsed, from the date each such Advance is deemed made hereunder through and including the date such Advance is repaid by the Borrower. Accrued and unpaid interest shall be due and payable, in arrears, on the Maturity Date applicable to such Advance.

(b)    After the occurrence and during the continuance of an Event of Default, interest on the outstanding principal balance of each Advance then outstanding shall accrue at a rate per annum equal to fourteen percent (14%) (the "Default Rate") and shall be payable upon demand. If the outstanding principal balance of any Advance accrues interest at the Default Rate in accordance with this Section 2.4(b) at any time, then the outstanding principal balance of such Advance shall continue to accrue interest at the Default Rate until such Event of Default has been cured (if capable of being cured) or waived in writing by the Lender in accordance with the terms hereof.

(c)    In no contingency or event whatsoever shall the rate or amount of interest paid by the Borrower under this Agreement exceed the maximum amount permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable. In the event that such a court determines that the Lender has received interest under this Agreement in excess of the maximum amount permitted by such law, (i) the Lender shall apply such excess, first, to any fees, costs, expenses or other amounts (other than principal and interest) due to the Lender hereunder, then to the unpaid balance of principal on any Advance then outstanding (as determined by the Lender in its sole and absolute discretion), and, if any excess interest remains thereafter, the Lender shall promptly refund such excess interest to the Borrower and (ii) the provisions of this Agreement shall be deemed amended to provide for such permissible rate.

Section 2.5 Repayment. Each Advance shall be repaid by the Borrower in full, in cash on the Maturity Date applicable to such Advance, without presentment, notice of dishonor, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower and each and every

4869-6232-3442.14

Person now or hereafter liable, absolutely or contingently, for the payment of the whole or any part of such Advance.

Section 2.6 <u>Prepayment</u>.  The Borrower may prepay any Advance at any time, in whole or in part, and any amount so prepaid shall be applied, first, to the repayment of all documented costs and expenses (including reasonable attorneys' fees and expenses) paid or incurred by the Lender and payable hereunder or under any other Finance Document, second, to the repayment of accrued and unpaid interest thereon and then, to the extent of any remainder, to principal.

Section 2.7 <u>Payments Generally</u>.  All payments under this Agreement and any other Finance Document shall be made to the Lender not later than 1:00 P.M. (Houston, Texas time) on the date when due and shall be made in Dollars in immediately available funds in accordance with the wire instructions previously provided by the Lender to the Borrower.  Whenever any such payment under this Agreement or any other Finance Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate set forth in <u>Section 2.4</u> during such extension.  Any and all payments made by the Borrower in favor of the Lender under this Agreement and the other Finance Documents shall be made without deduction or set off of any kind.

Section 2.8 <u>Term; Termination</u>.  This Agreement shall be effective as of the Closing Date, and will continue in full force and effect until the Termination Date (as defined below).  This Agreement may be terminated at any time and for any reason by (i) the Lender upon ninety (90) days' prior written notice to the Borrower and (ii) so long as no Event of Default has occurred and is continuing, the Borrower upon ninety (90) days' prior written notice to the Lender (any such termination notice delivered by the Lender or the Borrower hereunder, a "<u>Termination Notice</u>" and, the date that is ninety (90) days following delivery of any such Termination Notice by the Lender or the Borrower in accordance with this Section, the "<u>Termination Date</u>"); <u>provided</u>, <u>however</u>, that, notwithstanding delivery of any Termination Notice by the Lender or the Borrower, the occurrence of the Termination Date or anything to the contrary herein or in any other Finance Document, until all of the Obligations shall have been paid in full, in cash, and all Finance Documents between any Obligor and the Lender, or by any Obligor in favor of the Lender, shall have been terminated or have expired, all of the Lender's rights and remedies under this Agreement and the other Finance Documents shall survive and the Lender shall retain its Liens on and to all existing and future Collateral, and all of its rights and remedies with respect thereto, as provided in this Agreement and the other Finance Documents.

**ARTICLE 3**
**<u>REPRESENTATIONS AND WARRANTIES</u>**

To induce the Lender to enter into this Agreement and make the Advances hereunder, each Obligor hereby represents and warrants to the Lender that as of the Closing Date and as of the making of each Advance as follows:  (a) each Obligor has the full right, power and authority to enter into this Agreement and the other Finance Documents to which it is a party, to incur the indebtedness and other obligations evidenced by this Agreement and the other Finance Documents to which it is a party, and to consummate the transactions contemplated hereby and thereby, (b) each Corporate Obligor has taken all necessary and appropriate corporate or limited liability company, as applicable, action to authorize the execution and delivery of this Agreement and the other Finance Documents to which it is a party and, with respect to the Borrower, each Purchase Order submitted to the Lender (or its Affiliate) in connection therewith, (c) the execution, delivery and performance of this Agreement, the other Finance Documents and any other documents or instruments to be

7

executed and delivered by any Obligor in connection with the Advances made hereunder, do not and will not (i) require any consent, approval, authorization of, or filings with, notice to or other act by or in respect of, any Governmental Authority or any other Person or entity (other than any consent or approval which has been obtained and is in full force and effect); (ii) conflict with or otherwise contravene any provision of applicable law or any applicable regulation, order, writ, injunction or decree of any court or Governmental Authority applicable to any Obligor, or with respect to any Corporate Obligor, the articles of organization, operating agreement, or other organizational document of such Corporate Obligor; (iii) conflict with or otherwise cause a default under any material agreement, indenture, instrument or other document (including, without limitation, the Existing Bank Facility), or any judgment, order or decree, which is binding upon any Obligor or any of such Obligor's Properties or assets; or (iv) require, or result in, the creation or imposition of any Lien on or security interest in any Property or asset of such Obligor, other than Liens and security interests in favor of the Lender created pursuant to the Finance Documents; (d) this Agreement and the other Finance Documents are the legal, valid and binding obligation of each Obligor party thereto and are enforceable against such Obligor in accordance with their respective terms; (e) no information provided or statements made by any Obligor, its Affiliates or its representatives to the Lender contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading and (f) each Purchase Order submitted to the Lender (or its Affiliate) by the Borrower is a bona fide purchase order and, once confirmed, has been entered into by and between the Borrower and the Lender in the ordinary course of business. Each Obligor hereby represents and warrants to the Lender that as of the date hereof and after consummation of the transactions contemplated hereby and pursuant to the other Finance Documents, such Obligor is solvent, is able to pay its debts as they become due and has capital sufficient to carry on its business and all businesses in which it is about to engage, and now owns Property having a value both at fair valuation and at present fair saleable value greater than the amount required to pay its debts. The representations and warranties set out in this Article 3 shall survive the satisfaction and payment of the liabilities of the Obligors under this Agreement and the other Finance Documents and the termination and cancellation of the same.

**ARTICLE 4**
**CONDITIONS PRECEDENT**

Section 4.1 Conditions Precedent to Each Advance. The making of each Advance under this Agreement is subject to the sole and absolute discretion of the Lender upon the satisfaction of each of the following conditions precedent (except to the extent any such conditions precedent have been waived in writing by the Lender):

(a)     As of the Closing Date, the Lender shall have received the following from the Obligors, in form and substance satisfactory to the Lender:

(i)     duly executed copies of each of the Finance Documents, including, without limitation, this Agreement duly executed by each Obligor and the Pledge Agreement duly executed by each of the Obligors, which all such documents shall be, and at all times since their execution and delivery on the Closing Date have remained, in full force and effect as of the proposed date of such Advance;

(ii)     Lien and background search reports with respect to the Obligors, which show, among other things, no Liens on the Collateral;

8

4869-6232-3442.14

(iii)  UCC-1 financing statements in a form suitable for filing with the Secretary of State of the State of Texas, and for any other appropriate jurisdiction as is necessary, in the Lender's discretion, to perfect the Lender's Lien on the Collateral;

(iv)  copies of all certificates evidencing any certificated equity securities pledged to the Lender as Collateral pursuant to the Pledge Agreement, together with duly executed in blank, undated equity powers attached thereto;

(v)  a copy of the certificate of formation of each Corporate Obligor, certified to be true and complete by the Secretary of State of the State of Texas, and such other documents and certifications as the Lender may reasonably require to evidence that each Corporate Obligor is duly formed, validly existing and in good standing as a limited liability company in the State of Texas;

(vi)  copies of unanimous resolutions duly adopted by the board of managers (and, if necessary, the members) of each Corporate Obligor, approving and authorizing each Corporate Obligor's execution and delivery of the Finance Documents and the consummation of the transaction contemplated thereby;

(vii)  a copy of the operating agreement (or its functional equivalent) of each Corporate Obligor, as amended to (A) include Article 8 'opt-in' language designating such Corporate Obligor's equity interests as 'securities' within the meaning of Article 8 of the UCC (as defined in the Pledge Agreement), and (B) expressly permit and consent in advance to the transfer of such equity interests (to the extent constituting Collateral) to the Lender, and the admission of the Lender as a 'member' of such Corporate Obligor with full membership rights under such operating agreement, in connection with any exercise of the Lender's rights and remedies with respect to the Collateral under the Pledge Agreement and the other Finance Documents;

(viii)  evidence satisfactory to the Lender that all members, boards of managers (or, if applicable, directors), governmental, shareholder and material third party consents and approvals necessary or advisable in connection with each Obligor's execution and delivery of the Finance Documents, and the consummation of the transactions contemplated thereby, have been obtained; and

(ix)  such other certificates, documents and agreements as the Lender may reasonably request.

(b)  The Lender shall have received the following from the Borrower, in form and substance satisfactory to the Lender:

(i)  a Purchase Order with respect to the Product to be financed with the proceeds of such Advance, in form and substance reasonably satisfactory to the Lender, which is signed by an authorized representative of the Borrower and that has been confirmed in writing by an authorized representative of the Lender (or its Affiliate) (any such confirmed Purchase Order, a "Confirmed Purchase Order");

(ii)  concurrent with the delivery of such Purchase Order, a written request for such Advance, substantially in the form of Exhibit B (each, an "Advance Request"), which is signed by an authorized representative of the Borrower, specifies the portion of the applicable Purchase Price that is to be financed with the proceeds of such Advance and certifies that each of the

9

4869-6232-3442.14

conditions precedent to the making of such Advance pursuant to this <u>Article 4</u> have been satisfied (or, if applicable, otherwise waived by the Lender);

(iii)    a Note with respect to such Advance, duly executed by the Borrower in favor of the Lender; and

(iv)    payment in full, in cash of the unfinanced portion (if any) of the applicable Purchase Price as set forth, and in the manner provided under, the applicable Confirmed Purchase Order.

(c)    With respect to each Advance other than the initial Advance made by the Lender hereunder on or following the Closing Date, (i) at least fifty percent (50%) of the original principal amount of the immediately preceding Advance made by the Lender hereunder shall have been paid in cash, in accordance with the terms and conditions of this Agreement and the other Finance Documents, and (ii) the entire outstanding principal balance of each other previous Advance (other than the immediately preceding Advance subject to clause (i) above) made by the Lender hereunder, together with any and all accrued but unpaid interest thereon and other amounts owing in respect thereof, shall have been paid in full, in cash, in accordance with the terms and conditions of this Agreement and the other Finance Documents.

(d)    All documented costs and expenses (including reasonable attorneys' fees and expenses) paid or incurred by the Lender and payable hereunder or under any other Finance Document (including, without limitation, pursuant to <u>Section 8.1</u> hereof) as of the proposed date of the applicable Advance shall have been paid in full, in cash.

(e)    No Default or Event of Default shall have occurred and be continuing, or would result thereof.

(f)    Each of the representations and warranties contained in <u>Article 3</u> hereof and the other Finance Documents shall be true and correct as of the proposed date of such Advance, except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations shall be true and correct as of such earlier date.

## ARTICLE 5
## EVENTS OF DEFAULT

Section 5.1<u> Events of Default</u>. If any of the following events (each, an "<u>Event of Default</u>") shall occur and be continuing:

(a)    The Borrower or any other Obligor shall fail to pay any principal, interest or other amounts payable hereunder or under any Note or any other Finance Document when stated to be due in accordance with the terms hereof or thereof, and such default shall continue unremedied for a period of thirty (30) days; or

(b)    Any Obligor shall breach any representation of this Agreement, any other Finance Document to which such Obligor is a party or any Confirmed Purchase Order in any material respect; or

(c)    Any Obligor shall fail to comply with any provision or covenant in any respect of this Agreement, any other Finance Document to which such Obligor is a party (other than those

10

which constitute a default under another clause of this Section 5.1), or in any respect of any Confirmed Purchase Order, and such failure shall continue unremedied for a period of thirty (30) days after written notice thereof from the Lender to the Borrower; or

(d)    (1) Any Obligor shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its Property or assets, or any Obligor shall make a general assignment for the benefit of its creditors; or (2) there shall be commenced against any Obligor any case, proceeding or other action of a nature referred to in clause (1) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (3) there shall be commenced against any Obligor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its Property or assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (4) Borrower shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (1), (2) or (3) above; or (5) shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(e)    The Pledge Agreement shall cease to be in full force and effect, or shall cease in any respect to give the Lender the Liens, rights, powers and privileges purported to be created thereby (including, without limitation, a perfected first priority security interest in, and Lien on, all of the Collateral described therein superior to and prior to the rights of all third Persons), or any Obligor shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to the Pledge Agreement (after giving effect to any applicable cure or grace period thereunder); or

(f)    Any Guaranty or any provision thereof shall cease to be in full force and effect, or any Guarantor or any Person acting by or on behalf of such Guarantor shall deny or disaffirm any of the obligations of such Guarantor under such Guaranty, or any Guarantor shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to such Guaranty (after giving effect to any applicable cure or grace period thereunder), or the death or legal declaration of incompetency of any Individual Guarantor shall occur; or

(g)    The occurrence of any Change of Control; or

(h)    Without first obtaining prior written consent of the Lender, any Obligor shall enter into an agreement to effectuate (i) any sale or other disposition of all or substantially all of the Property or assets of any Corporate Obligor, in one transaction or in a series of transactions, or (ii) any consolidation or merger of any Corporate Obligor into another entity; or

(i)    Any default or "Event of Default" (as defined in the documents evidencing the Existing Bank Facility) shall have occurred under or in connection with the Existing Bank Facility;

11

then, and in any such event, (A) (i) upon the occurrence of an Event of Default specified in Section 5.1(d) above, automatically all Advances (with accrued interest thereon) and all other amounts owing on account of the Obligations shall immediately become due and payable and any and all commitments of the Lender hereunder to make Advances shall automatically terminate, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Obligors and (ii) upon the occurrence of an Event of Default other than one specified in Section 5.1(d) above, the Lender may at its option, by written notice to the Borrower, declare the Advances (with accrued interest thereon) and all other amounts owing on account of the Obligations (or any portion thereof) to be due and payable forthwith, whereupon the same shall immediately become due and payable and any and all commitments of the Lender hereunder to make Advances shall be terminated.  Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by each Obligor.

**ARTICLE 6**
**REMEDIES**

Section 6.1 Remedies Upon Event of Default.  Upon the occurrence and during the continuance of an Event of Default, the Lender shall have all rights of a secured party under the UCC, or any other applicable law in addition to, and not in lieu of, any rights and remedies available to the Lender under this Agreement or any other Finance Document.  The remedies of the Lender shall be cumulative and concurrent, and may be pursued singularly, successively or together, at the sole discretion of the Lender, and may be exercised as often as occasion therefor shall arise.  No act of omission or commission of the Lender, including, without limitation, any failure to exercise any right, remedy or recourse, available to the Lender, shall be deemed to be a waiver or release of the same, such waiver or release to be effected only through a written document executed by the Lender and then only to the extent specifically recited therein.  A waiver or release of any Event of Default shall not be construed as a bar, waiver or release of any subsequent right, remedy or recourse available to the Lender.  In addition to the foregoing, each Obligor agrees that, if at any time (i) any amount owing by it under this Agreement or any other Finance Document is then due and payable to the Lender, or (ii) an Event of Default shall have occurred and be continuing, then the Lender, in its sole and absolute discretion, may set off against and to appropriate and apply to the payment of the Obligations then outstanding (whether matured or unmatured, fixed or contingent or liquidated or unliquidated) any and all amounts which the Lender is obligated to pay over to the Borrower or any Guarantor (whether matured or unmatured).  Upon the receipt or collection of any amounts, or the realization of the proceeds of any Collateral, following an exercise of remedies by the Lender upon the occurrence and during the continuance of an Event of Default, the Lender shall be permitted to apply any such amounts so received, collected or realized to the then outstanding Obligations in any manner, in its sole and absolute discretion.

Section 6.2 Acknowledgment; Waiver.  Each Obligor hereby acknowledges that such Obligor has no defense, offset, or counterclaim to any of such Obligor's obligations under this Agreement and the other Finance Documents.  To the extent that any such defenses, claims or offsets exist as of the Closing Date, including, without limitation, any defenses arising out of or relating to any alleged breach of any duty of good faith and fair dealing, they are hereby waived and released in consideration of the Lender's acceptance of this Agreement and making of the Advances evidenced hereby.

**ARTICLE 7**
**GUARANTY**

4869-6232-3442.14

Section 7.1 <u>Guaranty</u>.  Each Guarantor hereby agrees that it is jointly and severally liable for, and, as a primary obligor and not merely as surety, absolutely, unconditionally and irrevocably guarantees to the Lender, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations and all documented costs and expenses (including reasonable attorneys' fees and expenses) paid or incurred by the Lender in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, the Borrower, any other Obligor or any other guarantor of all or any part of the Obligations, in each case, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising (such costs and expenses, together with the Obligations, collectively the "<u>Guaranteed Obligations</u>").  Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee hereunder notwithstanding any such extension or renewal.

Notwithstanding any provision to the contrary contained herein or in any other of the Finance Documents, the obligations of each Guarantor under <u>Section 7.1</u> shall not exceed an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law.  In determining the limitations, if any, on the maximum amount of such Guarantor's obligations pursuant to the preceding sentence, it is the intention of the parties hereto that any subrogation, indemnification or contribution rights of such Guarantor, whether arising from such Guarantor's obligations under this <u>Article 7</u> or otherwise, shall be taken into account.

Section 7.2 <u>Guaranteed Obligations Unconditional</u>.  The obligations of the Guarantors under <u>Section 7.1</u> are joint and several, absolute, unconditional and irrevocable, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Finance Documents, or any substitution, release, impairment or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this <u>Section 7.2</u> that the obligations of the Guarantors under this <u>Article 7</u> shall be absolute, unconditional and irrevocable under any and all circumstances.  Each Guarantor agrees that such Guarantor will not exercise any rights that it may now have or hereafter acquire against the Borrower or any other Obligor, or any security for the Guaranteed Obligations, that arise from the existence, payment, performance, or enforcement of such Guarantor's obligations under this <u>Article 7</u>, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, or indemnification, whether or not such claim, remedy, or right arises in equity or under contract, statute, or common law, unless and until such time as all of the Guaranteed Obligations have been paid in full, in cash.  Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by applicable law, the occurrence of any one or more of the following shall not alter or impair the obligations or liability of any Guarantor hereunder, which shall remain absolute, unconditional and irrevocable as described above:

      (a)     at any time or from time to time, without notice to any Guarantor, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

      (b)     any of the acts mentioned in any of the provisions of any of the Finance Documents or other documents relating to the Guaranteed Obligations shall be done or omitted;

13

4869-6232-3442.14

(c)     the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be modified, restated, supplemented or amended in any respect, or any right under any of the Finance Documents or other documents relating to the Guaranteed Obligations shall be waived or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released, impaired or exchanged in whole or in part or otherwise dealt with;

(d)     any Lien granted to, or in favor of, the Lender as security for any of the Guaranteed Obligations shall fail to attach or be perfected; or

(e)     any of the Guaranteed Obligations shall be determined to be void or voidable (including for the benefit of any creditor of any Guarantor) or shall be subordinated to the claims of any Person (including any creditor of any Guarantor).

With respect to its obligations hereunder, each Guarantor hereby unconditionally and irrevocably waives any right to diligence, presentment, demand of payment, protest and all notices whatsoever, and, subject to Section 7.5 below, any requirement that the Lender exhaust any right, power or remedy or proceed against any Person or any Collateral (or any portion thereof) under any of the Finance Documents or any other document relating to the Guaranteed Obligations, or against any other Person under any other guarantee of, or security for, any of the Guaranteed Obligations.  Each Guarantor hereby acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated under the Finance Documents and that the foregoing waivers are knowingly made in contemplation of such benefits.

Section 7.3 Reinstatement. The obligations of each Guarantor under this Article 7 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by the Lender, whether as a result of any insolvency, liquidation, receivership, bankruptcy, reorganization or other similar debtor relief law or otherwise, and each Guarantor agrees that it will indemnify the Lender on demand for all documented costs and expenses (including reasonable attorneys' fees and expenses) paid or incurred by the Lender in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any such insolvency, liquidation, receivership, bankruptcy, reorganization or other similar debtor relief law.

Section 7.4 Remedies.  The Guarantors hereby agree that, to the fullest extent permitted by applicable law, as between the Guarantors, on the one hand, and the Lender, on the other hand, the Guaranteed Obligations may be declared to be forthwith due and payable as specified in Section 6.1 (and shall be deemed to have become automatically due and payable in the circumstances specified in Section 6.1) for purposes of Section 7.1 notwithstanding any stay, injunction or other prohibition preventing such declaration (or preventing the Guaranteed Obligations from becoming automatically due and payable) as against any other Person and that, in the event of such declaration (or the Guaranteed Obligations being deemed to have become automatically due and payable), the Guaranteed Obligations (whether or not due and payable by any other Person) shall forthwith become due and payable by the Guarantors for purposes of Section 7.1.  The Guarantors acknowledge and agree that their obligations hereunder are secured, among other things, in accordance with the terms of the Pledge Agreement and that the Lender may exercise any and all remedies available thereunder in accordance with the terms thereof and the other Finance Documents.  To the fullest extent permitted by applicable law, each Guarantor hereby unconditionally and irrevocably waives any defense arising out of any such exercise of remedies, irrespective of whether such exercise may operate to impair or extinguish any right of

14

reimbursement or subrogation or other right or remedy of any Guarantor against any other Obligor, any other Person or any security for the Guaranteed Obligations.

Section 7.4 <u>Guaranty of Payment; Continuing Guarantee</u>.  Each Guarantor hereby agrees and acknowledges that the guaranty under this <u>Article 7</u> is a guaranty of payment and not of collection, is a continuing guaranty, and shall apply to the Guaranteed Obligations whenever arising.

Section 7.5 <u>Recourse of Individual Guarantors</u>.

(a)    Subject in all respects to <u>Section 7.5(b)</u> below, and without limiting the liability of any Obligor other than the Individual Guarantors (including, without limitation, any Corporate Obligor), no Individual Guarantor shall have personal liability under this <u>Article 7</u> or any other Finance Document and the Lender shall look solely to the Collateral pledged to the Lender by such Individual Guarantor under the Pledge Agreement, including, without limitation, the Pledged Interests (as defined in the Pledge Agreement), for payment and performance of the Guaranteed Obligations by such Individual Guarantor, and the Lender hereby agrees not to seek or enforce a deficiency judgment or other judgment establishing personal liability with respect to the Guaranteed Obligations against such Individual Guarantor, except for foreclosure actions or any other appropriate actions or proceedings in order to fully exercise the Lender's remedies in respect of, and to realize upon, the Collateral; <u>provided</u>, <u>however</u>, that the foregoing shall not apply (and be of no force or effect), and the Guaranteed Obligations shall be fully recourse to each Individual Guarantor, and each Individual Guarantor (on a joint and several basis) shall be personally liable for the Guaranteed Obligations, as otherwise set forth in this <u>Article 7</u>, if, at any time following the occurrence and continuance of an Event of Default, (i) the Aggregate Fair Market Value of the Pledged Interests is less than the amount of the Guaranteed Obligations then outstanding, (ii) an Event of Default under any of clauses (d), (e), (f), (g) or (h) of <u>Section 5.1</u> has occurred and is continuing or (iii) if following any exercise of the Lender's rights and remedies with respect to the Collateral (including, without limitation, any foreclosure and sale with respect thereto), the net cash proceeds so received, collected or realized by the Lender in connection therewith (regardless of the Aggregate Fair Market Value or actual value) are less than then the amount of the Guaranteed Obligations then outstanding, in which case, the Lender shall be entitled to seek and enforce, to the fullest extent permitted by applicable law, a deficiency judgment or other judgment establishing personal liability with respect to the Guaranteed Obligations against any Individual Guarantor.

(b)    Notwithstanding anything herein or in any other Finance Document to the contrary, nothing in this <u>Section 7.5</u> shall be deemed or construed to be a waiver, impairment or release of the Guaranteed Obligations or in any way impair, limit or otherwise affect the Guaranteed Obligations or the liability of any other Person to any of the other Finance Documents or the security interests granted to the Lender under the Pledge Agreement with respect to the Collateral, or to prevent the Lender from naming any Guarantor (including, without limitation, any Individual Guarantor) as a defendant in any action or suit for foreclosure or any other appropriate actions or proceedings in order to fully exercise the Lender's remedies in respect of, and to realize upon, the Collateral, and it is expressly understood and hereby agreed that any limitation on the personal liability of any Individual Guarantor under <u>Section 7.5(a)</u> (to the extent applicable) shall in no way affect or apply to the personal liability of any Obligor other than the Individual Guarantors (including, without limitation, any Corporate Obligor) or to any Individual Guarantor's personal liability to the Lender for the payment to the Lender of (i) any Distributions (as defined in the Pledge Agreement) collected by such Individual Guarantor from any Issuer (as defined in the Pledge Agreement) on account of the Collateral upon the occurrence and during the continuance of an Event of Default in accordance with, and the manner provided for under, the Pledge Agreement and the other Finance Documents or (ii) any loss, damages, costs and expenses suffered or incurred

15

by the Lender as a result of fraud or material misrepresentation knowingly made on the part of such Individual Guarantor hereunder or under any other Finance Document.

## ARTICLE 8
## MISCELLANEOUS

Section 8.1 <u>Payment of Expenses; Indemnification</u>

      (a)      Each Obligor hereby agrees to promptly pay Lender upon demand: (i) [reserved]; (ii) all reasonable and documented out-of-pocket costs and expenses of the Lender after the occurrence and continuance of an Event of Default in connection with the enforcement of this Agreement, any other Finance Document, any Purchase Order, any Confirmed Purchase Order or any of the other documents and instruments referred to herein and therein (including in connection with the sale, lease or license of, collection from, or other realization upon any of the Collateral) or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceedings (including the fees and disbursements of counsel for the Lender); (iii) any and all present and future stamp, excise and other similar documentary taxes with respect to the foregoing matters and hold the Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission to pay such taxes and (iv) any and all documented demurrages, charges, costs and other expenses paid or incurred by the Lender with respect to the discharge of any vessel in connection with the delivery of any Product purchased by (or for the benefit of) the Borrower from the Lender pursuant to any Confirmed Purchase Order.

      (b)      In addition to the payment of expenses pursuant to clause (a) above, each Obligor hereby agrees to indemnify the Lender and each of its respective officers, partners, members, trustees, advisors, directors, employees, representatives, agents  and Affiliates (each, an "<u>Indemnified Person</u>") from and hold each of them harmless against any and all liabilities, obligations (including removal or remedial actions), losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' and consultants' fees and disbursements) incurred by, imposed on or assessed against any of them as a result of, or arising out of, or in any way related to, or by reason of, any investigation, arbitration, litigation or other proceeding (whether or not such investigation, arbitration, litigation or other proceeding is brought by or on behalf of any Obligor and whether or not caused by, or arising, in whole or in part, out of the negligence of such Indemnified Party) related to the entering into and/or performance of this Agreement or any other Finance Document or the use of the proceeds of the Advances hereunder or any other transactions contemplated herein, in any other Finance Document, or the exercise of any of their rights or remedies provided herein or in the other Finance Documents (but excluding any such losses, damages, penalties, claims, actions, judgments, suits, costs, expenses and disbursements incurred by reason of the gross negligence or willful misconduct of the Person to be indemnified as determined by a final non-appealable judgment of a court of competent jurisdiction).  To the extent that the undertaking to indemnify, pay or hold harmless any Indemnified Person set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Obligors shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under applicable law.

Section 8.2 <u>Severability; Headings</u>.  In case any provision contained herein (or part thereof) shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or other unenforceability shall not affect any other provision (or the remaining part of the affected provision) hereof, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained herein, but only to the extent

16

4869-6232-3442.14

that such provision is invalid, illegal or unenforceable. Headings of Sections in this Agreement are solely for convenience or reference, do not constitute a part hereof and shall not affect the meaning, construction or effect hereof.

Section 8.3 Counterparts.  The Lender and the Obligors agree that this Agreement may be executed in multiple originals, each of which shall be considered an original for all purposes and, collectively, shall be considered to constitute this Agreement.  The Lender and the Obligors further agree that signatures transmitted in Portable Document Format (.pdf) may be considered an original for all purposes, including, without limitation, the execution of this Agreement and enforcement of this Agreement.

Section 8.4 Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the Lender and the Obligors and their respective successors, assigns and legal representatives. No Obligor shall assign its rights and obligations under this Agreement or any other Financing Document by any means without first obtaining the prior written consent of the Lender.  This Agreement shall not confer any rights or remedies upon any Person or other third party other than the Obligors and the Lender and their respective successors and permitted assigns.

Section 8.5 Integration; Amendments. This Agreement supersedes all previous agreements, oral or written, and constitutes the entire agreement among the Obligors and the Lender respecting the subject matter hereof, and neither any Obligor nor the Lender shall be entitled to benefits other than those specified herein.  This Agreement may be amended or modified only by an agreement in writing signed by each Obligor party thereto and the Lender.

Section 8.6 Notices.  Any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other party, or whenever any of the parties desires to give or serve upon any other a communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and either shall be delivered in person with receipt acknowledged or sent by registered or certified mail, return receipt requested, postage prepaid, to the address of such Person as provided below:

If to Lender, to:

> Tradeland Group B.V.
> c/ Ciervo, 1
> 28223, Pozuelo de Alarcón
> Madrid, Spain
> Attention: Operations Tradeland Group
> Email:  ops@tradelandgroup.com

with copy (which shall not constitute notice) to:

> Nixon Peabody LLP
> 70 W. Madison St., Suite 5200
> Chicago, IL 60602 USA
> Attention: David R. Brown
> Email: drbrown@nixonpeabody.com

If to any of the Obligors, c/o:

17

4869-6232-3442.14

Space City Cement, LLC
1755 Federal Rd.
Houston, TX 77015 USA
Attention: Kevin Harper and John Mecom III
Email: kevin@spacecitycement.com and

john3@spacecitycement.com

with copy (which shall not constitute notice) to:

Murrah & Killough, PLLC
3000 Wesleyan St. - Suite 305
Houston, TX 77027 USA
Attention: Daniel Vazquez
Email: dvazquez@mktxlaw.com

and to:                          Royston Rayzor
1415 Louisiana, Ste 4200
Houston, TX 77002 USA
Attention: Blake E. Bachtel
Email: blake.bachtel@roystonlaw.com

Section 8.7 <u>Governing Law; JURY WAIVER</u>. This Agreement and the rights and obligations of the parties under this Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, without regard to conflict of law principles (but including and giving effect to Sections 5-1401 and 5-1402 of the New York General Obligations Law). EACH OBLIGOR IRREVOCABLY WAIVES, AND THE LENDER BY ITS ACCEPTANCE HEREOF THEREBY WAIVES, ANY RIGHT OR CLAIM TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT, OR OTHERWISE) IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OTHER FINANCE DOCUMENT. EACH OBLIGOR FURTHER WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER TO ENTER THE LOAN RELATIONSHIP EVIDENCED HEREBY AND BY THE OTHER FINANCE DOCUMENTS.

[signature pages follow]

18

4869-6232-3442.14

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized representatives as of the Closing Date.

Obligors:

SPACE CITY CEMENT, LLC
as Borrower

By: _____
Kevin Harper, Manager

SPACE CITY CEMENT DISTRIBUTION, LLC
as a Guarantor

By: _____
Kevin Harper, Manager

_____
JOHN MECOM III, as an Individual Guarantor

_____
KEVIN HARPER, as an Individual Guarantor

Signature Pages to Purchase Order Financing Agreement (Space City Cement)
4869-6232-3442.14

**Lender:**

TRADELAND GROUP, B.V.

By: _____

Name: ____PEDRO  Aaron_____

Title: _____DiRECTOR_____

Signature Page to Purchase Order Financing Agreement (Space City Cement)

## Exhibit A

Form of Note
(see attached)

[FORM OF] SECURED PROMISSORY NOTE

$_____.__                                          Date:  _____ __, 202_

FOR VALUE RECEIVED, SPACE CITY CEMENT, LLC, a Texas limited liability company (the "Borrower"), promises to pay to the order of TRADELAND GROUP, B.V., (hereinafter, together with any holder hereof, the "Lender"), whose address is Tradeland Group B.V., c/o Ciervo, 1, 28223, Pozuelo de Alarcón, Madrid, Spain, the sum of _____ Dollars ($_____.__) (the "Original Principal Amount"), together with interest thereon, as described in this secured promissory note (this "Note"). Capitalized terms used, but not defined, in this Note have the meanings given them in the Finance Agreement (as defined below).

This Note evidences an Advance made by the Lender in the Original Principal Amount stated above pursuant to the terms of that certain Purchase Order Financing Agreement dated as of November 26, 2024 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Finance Agreement") by and among the Borrower, the Guarantors party thereto and the Lender, and is one of the "Notes" referred to in the Finance Agreement subject to the provisions and terms thereof.

Reference is made to the Finance Agreement for provisions affecting this Note regarding applicable interest rates, principal and interest payment dates, prepayments, final maturity, default, acceleration of maturity, exercise of rights, payment of attorneys' fees, court costs and other costs of collection and certain waivers by the Borrower and others now or hereafter obligated for payment of the amounts due under this Note. The Lender is entitled to all of the benefits and security provided for in the Finance Agreement and the other Finance Documents, including, without limitation, each Guaranty and the Pledge Agreement executed and delivered in connection therewith.

The Advance evidenced hereby has been made by the Lender in accordance with terms of the Finance Agreement and this Note has been delivered at the Lender's main office set forth above.  Such Advance and all payments on account of the principal and interest thereof, shall be recorded on the books and records of the Lender and the principal balance as shown on such books and records, or any copy thereof certified by an officer of the Lender, shall be rebuttably presumptive evidence of the principal amount owing hereunder.

Except for such notices as may be required under the terms of the Finance Agreement, the Borrower waives presentment, demand, notice, protest, and all other demands, or notices, in connection with the delivery, acceptance, performance, default, or enforcement of this Note, and assents to any extension or postponement of the time of payment or any other indulgence.

This Note shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to conflict of law principles (but including and giving effect to Sections 5-1401 and 5-1402 of the New York General Obligations Law), and shall be binding upon the Borrower and its legal representatives, successors, and assigns.  Wherever possible, each provision of the Finance Agreement and this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Finance Agreement or this Note shall be prohibited by or be invalid under such law, such provision shall be severable, and be ineffective to the extent of such prohibition or invalidity, without invalidating the remaining provisions of the Finance Agreement or this Note.  This Note constitutes a Finance Document under the Finance Agreement.

*[Remainder of Page Intentionally Left Blank—Signature Page Follows]*

4869-6232-3442.14

IN WITNESS WHEREOF, the Borrower has executed this Note as of the date set forth above.

<u>Borrower</u>:

SPACE CITY CEMENT, LLC,
a Texas limited liability company


By:_____

Name:_____

Title:_____

Exhibit A to Purchase Order Financing Agreement – Form of Note (Space City Cement)

**Exhibit B**

Form of Advance Request
(see attached)

## [FORM OF] ADVANCE REQUEST

_____ __, 202_

Tradeland Group B.V.
c/o Ciervo, 1
28223, Pozuelo de Alarcón
Madrid, Spain
Attention:        _____
Email:              _____

Reference is made to that certain Purchase Order Financing Agreement dated as of November 26, 2024 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Finance Agreement") by and among SPACE CITY CEMENT, LLC, a Texas limited liability company (the "Borrower"), each Person party thereto from time to time as a Guarantor and TRADELAND GROUP, B.V., in its capacity as Lender thereunder (in such capacity, together with its successors and assigns, the "Lender").  Capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the Loan Agreement.

1.  The undersigned, in its capacity as the _____ of the Borrower, hereby certifies that it is a duly authorized signatory and representative of the Borrower.

2.  The undersigned, on behalf of the Borrower, hereby requests that the Lender elect, in its sole and absolute discretion, to make a deemed Advance pursuant to Section 2.1 of the Finance Agreement in the original principal amount of $_____ in connection with the Purchase Order attached hereto as Exhibit A.

3.  The undersigned, on behalf of the Borrower, hereby certifies that as of the date hereof, and the date such proposed Advance would be deemed made pursuant to Section 2.3 of the Finance Agreement (the "Advance Date"), immediately after giving effect to the Advance requested hereby: (i) there exists and there shall exist no Default or Event of Default under the Finance Agreement or the other Finance Documents; and (ii) each of the representations and warranties contained in the Finance Agreement and the other Finance Documents is true and correct as of the date hereof, and will be true as of the Advance Date, except to the extent that such representation or warranty expressly relates to an earlier date in which case such representation or warranty is true and correct as of such earlier date.

This letter constitutes a "Finance Document" as defined in the Finance Agreement.  This letter constitutes a binding contract enforceable by the Lender against the Borrower.  This letter shall be governed by the laws of the State of New York, without regard to conflict of law principles (but including and giving effect to Sections 5-1401 and 5-1402 of the New York General Obligations Law).

[_REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS_]

**IN WITNESS WHEREOF**, the undersigned has executed this Advance Request as of the date set forth above.

<u>Borrower:</u>

SPACE CITY CEMENT, LLC

By: _____
Title: _____

Exhibit B to Purchase Order Financing Agreement – Form of Advance Request (Space City Cement)